**Robin BIKO, et al, and Dwight Toms, et al, Appellants,**

v.

**SIEMENS CORPORATION, Siemens Aktiengesellschaft, Siemens Information and Communication Networks, Inc., and Efficient Networks, Inc., Appellees.**

No. 05–05–01318–CV.

Court of Appeals of Texas, Dallas.

Oct. 17, 2007.

Rehearing Overruled Feb. 28, 2008.

Keith A. Langley, Dallas, R. Alan York, Godwin Pappas Langley Ronquillo, LLP, Houston, Gregory M. Weinstein, Godwin Gruber, LLP, Dallas, David W. Holman, The Holman Law Firm, Houston, TX, for Appellant.

Christopher Landau, Gregg F. LoCascio, Elizabeth Petrela Papez, Kirkland & Ellis LLP, Washington, DC, Nina Cortell, George Walter Bramblett and Ben L. Mesches, Haynes and Boone, LLP, Dallas, TX, for Appellee.

Before Justices WHITTINGTON, BRIDGES, and FRANCIS.

## OPINION

Opinion by Justice FRANCIS.

Ninety-one current and former employees [1] of Efficient Networks, Inc. (Efficient) appeal the trial court's summary judgment in favor of appellees Siemens Corporation, Siemens Aktiengesellschaft (Siemens AG), Siemens Information and Communication Networks, Inc. (Siemens ICN), and Efficient. In three issues, appellants contend the trial court erred in granting summary judgment because appellees did not conclusively establish their right to summary judgment and fact issues remain on appellants' causes of action for (1) breach of a stock option agreement, (2) fraud, and (3) breach of contract. We affirm.

This case arises from Efficient's merger with Memphis Acquisition, Inc., a wholly-owned subsidiary of Siemens Corporation set up expressly for the merger. Siemens AG is a diversified global technology company headquartered in Munich, Germany. Siemens Corporation serves as a holding company for Siemens AG's business interests in the United States. Efficient and Siemens ICN are subsidiaries of Siemens Corporation.

At issue is the disposition of approximately $80,000,000 in unallocated funds remaining at the termination of a three-year employee retention program instituted as part of the merger. Appellants contend Efficient's employees were contractually entitled to the leftover money and appellees represented they would receive it to induce them to stay after the merger. Appellees contend appellants received everything due to them under the retention program.

Appellants sued appellees in two lawsuits, eventually consolidated, alleging variously that appellees failed to abide by the retention agreement, that Efficient's offi-

1. Appellants are Mark Allen Adkins, Glen Arceneaux, Mark Beider, Neill R. Bell, Vernon Benton, Robin Biko, Constance Blankenship, Eduard Blonk, John Bowers, Charles Carter, Guy Dame, Timothy D'Angelo, James J. Daughtery, John D'Auria, Huey Dixon, Timothy Doll, John Y. Du, Stephene K. Dunbar, Ryan Eccles, Kalaiselvi Eswaran, Rudolfo Fidel, Angela Fitzgerald, David Foster, Michael Fox, Bart Gaines, Mark Geinosky, Peggy Gerwig, Calvin Gluck, Eric Gonzalez, Xiaofeng Gu, Brian Hall, Tracy Hawn (Carlson), Archer Henderson, Rhonda Hiesberger, Timothy Hsieh, Lucy Huang, Martine Huizing van-Etten, Rebecca Hukill, Ernie Ianance, Greg Imahara, Cherrone Johnson, Charles David Kennedy, Amir Khazaie, Rebecca Kocks, David Korth, D'Andre Ladson, Beverly Lan-

dis, Sean Large, Scott Ledbetter, Lip Thia Leow, Hongjun Li, Maritsa Lohere, Jason Lombardo, Ruben Madrigal, Kim Martin, Christina Mason, Raymond Massey, Tom McBurney, Patty McCaskey, Richard McCauley, David Mark Mead, Amy Medina, Patrica A. Miller, Sean Montgomery, Rene Mulder, Ruth Munevar, Mario Paalvast, Robert Richey, Benjamin Runnels, Tracy Runnels, David Schmertz, Laura Shacklette, Jeff Smith, Moshe Speckman, Kerry Stover, Tim Sweat, Todd Tatum, Jarrod Thornton, Dzung Truong, Frederick Tucker, Heather Tucker, Jimmy E. Tucker, Charles Van, Hugo van den Hurk, Ron Visser, Thomas J. Willie, III, Daniel Winterroud, I–Chin Yu, Dwight Toms, Barry Chen, and Jody Cire. Appellant Robert Sawler dismissed his appeal.

cers fraudulently misrepresented the elements of the retention program to convince the employees to stay with Efficient after the merger, and that appellees' underhanded efforts to modify the retention agreement triggered a breach of Efficient's pre-merger stock plan. In a series of rulings, the trial court granted summary judgment for appellees on appellants' major claims, and appellants nonsuited their remaining claims.

We review de novo the trial court's determination to grant summary judgment to appellees. *Dickey v. Club Corp. of Am.*, 12 S.W.3d 172, 175 (Tex.App.-Dallas 2000, pet. denied). The trial court stated its rationale for granting summary judgment on appellants' breach of contract claim. Because the trial court granted final summary judgment on the other two claims without specifying the grounds it found persuasive, appellants must show on those two claims that each summary judgment ground alleged by appellees is insufficient to support the trial court's judgment. *See Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995). We will affirm if any of appellees' grounds has merit. *See id.*

Appellees moved for summary judgment on both traditional and "no evidence" grounds. *See* TEX.R. CIV. P. 166a(c), (I). In reviewing the "traditional" portion of the summary judgment, we determine whether appellees met their summary judgment burden by establishing that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. *See* TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002). Appellees are entitled to summary judgment if they conclusively negated an essential element of each of appellants' claims. *See Grant*, 73 S.W.3d at 215. Appellees bear the burden of proof and we resolve all doubts about the existence of a genuine issue of material fact against them. *See Nixon*, 690 S.W.2d at 548–49. We view all evidence and any reasonable inferences in the light most favorable to appellants. *Id.* at 548–49.

We review appellees' "no evidence" summary judgment under the same standard as a directed verdict. *King Ranch v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). We examine the record in the light most favorable to appellants and disregard all contrary evidence and inferences. *Id.* at 751. If our examination reveals that appellants produced more than a scintilla of probative evidence to raise a genuine issue of material fact, then summary judgment was improperly granted. *Id.* The evidence must be sufficient to create more than a mere surmise or suspicion of a fact; rather the evidence must allow reasonable and fair-minded people to differ in their conclusions. *Id.*

Viewed in the light most favorable to appellants, the evidence shows Efficient was an industry leader in developing broadband networking equipment known as digital subscriber line devices ("DSL"). Siemens Corporation was an early investor in Efficient, and Siemens ICN produced complementary technology. In 2000, Efficient CEO Mark Floyd began discussing with Siemens ICN executives Roland Koch and Anthony Maher the possibility of merging Efficient into the Siemens group.

Both sides to the potential merger recognized that the value of Efficient lay largely with its skilled workforce. The merger would not be successful unless Efficient's employees could be retained. Like most telecom companies, Efficient compensated and "incentivized" its employees by awarding them stock options. Efficient awarded employees options through its "1999 Stock Plan," under which employees received stock options with

strike prices above the current market value of Efficient stock and with four-year vesting periods. Each optionee would be given a "Stock Plan Agreement" to sign along with an Efficient representative setting forth the optionee's number of options, strike price, and vesting date. By signing the Stock Option Agreement, the optionee agreed that the option was governed by the 1999 Stock Plan and the optionee accepted "as binding, conclusive and final, all decisions or interpretations of the Administrator upon any questions relating to the Plan and Option Agreement." All but four appellants participated in the 1999 Stock Plan.

The stock option plan was the source of two key obstacles to the proposed merger. First, because Siemens Corporation's stock was not then publicly traded in the United States, there was the issue of how the new merged entity could retain its employees without offering stock options. Second, there was the issue of how the new entity would address the outstanding, unexercised Efficient options already in employees' hands. In the event of a merger, section 13(c) of the 1999 Stock Plan required the successor company to either assume the outstanding stock options or to substitute an equivalent.

To solve the stock option issues, Floyd and Koch devised a two-phase retention program that would provide cash bonuses in lieu of stock options. The first phase, known as the Memphis Retention Plan (MRP), would provide automatic across-the-board bonuses to almost every employee who stayed with the company for the first year after the merger. The MRP would distribute $50 million to employees in two equal payments to be made six months after the merger and on the first anniversary of the merger.

The second phase, to be known as the Discretionary Retention Plan (DRP), would award incentive bonuses to selected key employees during the second and third years after the merger. Each participant would be assigned a maximum DRP award. To receive the maximum award, the participant would have to meet performance targets and Efficient would also have to reach preset company-wide goals. The DRP would be funded with an initial $97 million. An additional $22 million would be set aside in an unallocated reserve fund to cover future allocations to existing participants and new hires. If a participant did not earn the maximum award, left the company, or was fired for cause, that participant's DRP cash award would go back into the unallocated fund. The DRP program would terminate on the third anniversary of the merger.

On February 2, 2001, Koch and William Moran, vice president of mergers & acquisitions of Siemens Corporation, transmitted a letter to the Efficient Board of Directors formally proposing that Siemens acquire Efficient and outlining the key terms of the acquisition. Koch and Moran proposed paying holders of "in the money" Efficient stock options the spread between the purchase price and the option exercise price as the options vested. Koch and Moran further wrote that " '[o]ut of the money' options would be cancelled, but holders of such options would be eligible to participate in a proposed Efficient Networks Retention Program, as outlined in the addendum to this letter." The addendum to the letter described the MRP as compensation to employees for "out of the money" options. Koch and Moran described the DRP's purpose as "to create incentives of a more significant scale for members of Memphis' management and key engineering, sales and other employees." Each DRP participant would receive a letter that would "describe the vesting,

performance criteria and payment of funds under the plan."

On February 21, 2001, Efficient's Board of Directors approved and signed an agreement and plan of merger between Efficient, Siemens Corporation, and Memphis Acquisition, Inc. The plan of merger called for Efficient to merge with Memphis Acquisition, forming a new Siemens Corporation subsidiary which would retain Efficient's name.

Schedule I to the merger agreement sets forth the MRP and DRP employee retention programs that the new Efficient would begin after the merger. A Compensation Committee consisting initially of Koch, Floyd, Maher, and Siemens executive Larry McMillen, would administer the programs. Schedule I reiterated the scheme for the MRP and DRP previously announced in Koch and Moran's February 2, 2001 letter. The programs would be funded with $169 million. The MRP payment would automatically enroll most employees and would distribute approximately $50 million to the participants in two equal installments at the six-month and one-year mark. Each DRP participant would be "notified of their eligibility for the DRP and their target DRP incentive amounts. Each selected employee will be given an individual participation letter that will describe the vesting, performance criteria and payment of Awards under the DRP." The criteria for awarding a participant a DRP bonus depended upon a combination of individual performance targets and company-wide performance. DRP bonuses would be paid on the second and third anniversaries of the merger. At the end of the third year, the DRP would terminate. The sum of $97 million was allocated to the DRP. An additional $22 million and amounts forfeited by participants who were terminated for cause or voluntarily left the company would "remain unallocated and set aside for future allocations under the DRP as determined by Memphis management, subject to the approval of the Compensation Committee."

After signing the merger agreement, Floyd transmitted a February 21, 2001 email to all Efficient employees announcing the merger and opening a dialogue with employees regarding what was to happen to the company. In his email, Floyd communicated the treatment of stock options and the retention program:

> Stock options will be treated as follows: 1) stock options that are priced under $23.50 per share and are vested will be converted to cash at the difference between the option price and $23.50 per share at the close of the transaction, 2) stock options the [sic] are priced under $23.50 and are not vested, will continue to vest and will be paid in cash at the difference between the option price and $23.50 per share according to the vesting schedule, 3) stock options that are priced greater than $23.50 per share will be replaced with a cash incentive package that totals over $150 million.

Memphis Acquisition, Inc.'s March 2, 2001 written tender offer for Efficient's stock included a section styled "Employee Stock Options and Other Employee Benefits." This section obligated the surviving company to cancel the outstanding stock options and pay in cash to each optionee holding an option with a strike price below the $23.50 tender offer price the difference between the option exercise price and the tender offer price. The section described the MRP and the DRP as follows:

> Certain employees of the Company and of the controlled affiliates of Siemens AG will be eligible to participate in the Discretionary Program. Bonuses awarded under the Discretionary Program will vest and become payable if a combination of corporate and individual

performance measures are achieved prior to each of the second and third anniversaries of the Effective Time, provided that the participant is employed by the Company or its affiliate on the applicable payment dates.

The Retention Program will offer awards of up to an aggregate maximum of $169 million, which will be divided between the Retention Programs. Of the $169 million, approximately $50 million will be allocated to the Company Retention Program and approximately $97 million will be allocated to the Discretionary Program. At least $22 million, plus any forfeited amounts under the Retention Programs, will remain unallocated and will be set aside for future allocations under the Discretionary Program.

While Memphis Acquisition, Inc. was buying Efficient stock, Floyd and other Efficient executives held a series of meetings with Efficient employees to explain how the merger would affect them. During a company-wide meeting held on February 23, 2001, Floyd told the employees that Siemens would fund a $169 million employee retention fund and all the money would be distributed within the three-year program. Floyd encouraged the employees to stay and indicated that if anyone left, it "would be more money for the rest of us." During a March 7, 2001 sales meeting, Jack Brooks, Efficient's vice president of human resources, conducted a PowerPoint presentation on the merger. Brooks's presentation included a slide stating the retention program "essentially serves as an initial substitute for stock options going forward." In a second slide, Brooks wrote

### Is There Further Upside?

● A portion of the retention pool has been reserved for discretionary adjustments to individual Year Two/Three award levels.

● Awards set aside for employees that leave the Company will remain in the pool for distribution to other participants.

● The retention plan will be fully paid out by the end of year three.

Floyd was present during Brooks's presentation and had helped prepare the content of the slides. A substantially similar message was delivered to Efficient's European employees in Amsterdam by Floyd and Efficient officer Paul Coutourier.

The presentations left many employees with the understanding that, at the end of the third year, any unallocated DRP funds would be distributed to the remaining participants in a process that became known within the company as "Last Man Standing." Not only did the employees have this understanding, but Brooks also believed "Last Man Standing" was part of the DRP agreement. Jill Manning, Efficient's chief financial officer, testified at her deposition that Floyd's intent was to distribute the entire $169 million to the employees and future employees during the course of the retention program.

On March 30, 2001, shortly before the merger, Floyd sent an email to Koch, Maher, McMillen, and Dieter Diehn, another Siemens ICN officer. Floyd represented to the Siemens officers that the initial DRP rules he had drafted were already in place. Floyd presented a series of additional rules that would govern "only the reserve balances and forfeited monies which will consist of the new reserve DRP fund." Included within the proposed rules was one for a final distribution of the money at the end of the third year: "Total payout: The total sum of the MRP and DRP will be paid out to Employees and the plan will terminate at the third anniversary of the effective date (deal closing

date).'' On April 10, 2001, Floyd followed up with an email to McMillen reporting that "Roland [Koch] decided to go with the DRP plan as proposed with the following exception. I [cannot] grant any DRP allocations to non-US Siemens employees (not including the original non-US Efficient employees).''

The merger took place on April 3, 2001. After merging with Memphis, Efficient became part of Access Solutions, Inc., another Siemens subsidiary. Floyd became president of Access Solutions and James Hamilton succeeded Floyd as CEO of Efficient.

Those employees who held Efficient stock were paid $23.50 per share upon tendering their stock. Employees holding vested "in the money" options were paid the difference between their option strike price and the $23.50 tender price. Additionally, employees holding unvested "in the money" options were paid the difference between their strike price and the $23.50 tender price upon the vesting of their options. Employees holding "underwater" options with strike prices above $23.50 were not paid anything.

On May 15, 2001, the Compensation Committee held a meeting and agreed to recommend the draft retention plans with minor changes. On that same day, Efficient's Board of Directors formally approved the MRP and DRP plans. The employees and some officers, such as Brooks, were not informed that the plans were approved.

Under the plans approved, each DRP participant would be given a letter setting forth the participant's maximum DRP award over the course of the two-year plan. A copy of the DRP plan would be attached and referenced within the letter. The DRP letter would contain language requiring the employee to accept the plan as binding upon the employee and agreeing that the written plan superceded all prior oral understandings and agreements.

The approved DRP plan provided that employees would not have the right to participate in the retention plan "other than as provided in the Plan." It gave the Compensation Committee sole authority to interpret the plan and to determine the maximum amount of each participant's bonus. It conditioned payment of the maximum bonus upon achievement of personal and corporate performance objectives. It stated that it superceded any and all prior retention arrangements, programs, or plans previously offered by Efficient. The approved plan did not provide for a final distribution of unallocated funds.

Even after the adoption of the plan by the Board, appellees continued to negotiate between themselves the terms of the DRP, including whether there should be a final distribution. The items under negotiation are reflected in a Siemens ICN "DRP Plan Analysis" prepared for McMillen on November 12, 2001 and marked "Highly Confidential." The DRP Plan Analysis contains copies of key documents related to the DRP, including a draft version of a "Revised DRP Plan" containing a section 8 styled "Final Distribution." Section 8 of the revised plan provides:

The Remaining Balance, if any, shall be distributed on a pro rata basis among all participants who become vested in the right to receive payment of all or part of a Discretionary Bonus Installment with respect to a Final Vesting Date. Each Participant eligible to receive a distribution of a portion of the Remaining Balance in accordance with the foregoing sentence shall receive an amount equal to the product of (A) a fraction the numerator of which is the amount of the Discretionary Bonus Installment in which a Participant becomes vested in respect of the Final

Vesting Date and the denominator of which is the aggregate amount of Discretionary Bonus Installments in which all of the Participants become vested in respect of the Final Vesting Date, multiplied by (B) the Remaining Balance.

Appellants have not pointed to any evidence in the record showing that the revised DRP plan was ever adopted and implemented by appellees.

After the retention plans were implemented, accounting records show Efficient accrued $169 million for payment of the retention bonuses over the three-year period. The first-year MRP payments were made to employees as promised. During the second year, however, economic conditions within the telecommunications industry worsened and Efficient did not meet its targeted goals. Emails exchanged between Efficient's and Siemens's executives show an effort to curb DRP payments. In one email, Hamilton informed Floyd that Siemens's counsel had opined there was enough "wiggle room" in the contracts signed to deny the employees the "last man standing" payment that had been orally promised. Efficient's accountants revised the accounting accruals to reflect the entire $169 million would not be paid to employees.

On or about April 3, 2002, one year after the merger was finalized, Efficient presented the DRP participants with DRP award letters to sign. The award letters describe the DRP as a "special bonus," the maximum target amount of which could be earned if corporate and individual performance objectives were met. To be eligible for the DRP award, the employee was required to sign the letter thus acknowledging the employee had read and understood the plan, accepted his or her DRP bonus subject to the terms of the plan, and agreed to be bound by the terms of the DRP plan. All appellants except Robin Biko signed their DRP award letters and received timely DRP bonuses.

When the DRP awards came due, Efficient gave the participants credit for meeting their individual goals, but did not credit them with the maximum awards because Efficient had lost money during the course of the retention program. Employees began contacting Brooks to inquire about the final distribution payment. When Brooks forwarded the inquiries to Hamilton, he requested guidance from the Compensation Committee. In response, Hamilton and Brooks were instructed not to discuss the details of the retention plans with the employees.

In a June 10, 2002 letter, to "clear up any confusion," Siemens ICN CEO George Nolen wrote Hamilton that there would be no final distribution because "the DRP does not contain any provision under which any remaining or unused DRP funds are automatically paid to remaining Plan participants, all employees, or any other group."

Because of adverse business conditions in the telecommunications industry, many employee/participants in the DRP were eventually terminated from their employment with Efficient. Because many employees departed and maximum DRP bonuses were not awarded, the unallocated portion of the DRP swelled to $80 million. At the end of the third year, appellees retained the unallocated portion of the DRP rather than distributing it.

Before reviewing appellants' issues, we pause to address two preliminary matters. First, although Siemens AG and Siemens Corporation are identified as parties to the appeal, appellants have not challenged on appeal the trial court's summary judgment ruling in their favor. Accordingly, we affirm the trial court's summary judgment in favor of Siemens AG and Siemens Corporation. *See Kagan–Edelman Enters. v.*

*Bond,* 20 S.W.3d 706, 707 (Tex.2000) (per curiam).

Second, appellants present the issues in the reverse order in which the claims were pleaded. Appellees contend we should consider the issues in the order the claims were raised in the pleadings and disposed of in partial summary judgments. Because determination of the third issue, raising contentions about the breach of contract claim, controls resolution of the fraud issue, and because there would be no breach of the stock option agreement had the alleged contract been performed, we turn first to appellants' third issue regarding breach of contract.

In their third issue, appellants contend summary judgment should be reversed on their breach-of-contract claim because they raised a fact issue regarding the existence of an April 2001 contract—consisting of emails, letters, presentations, and merger-related documents—requiring appellees to make a final distribution of the unallocated portion of the retention fund. Appellees respond that appellants' alleged contract does not satisfy the statute of frauds. Further, appellees contend the parties' formal written contract, the April 3, 2002 award letter and its incorporated DRP plan, constitutes an integrated written contract that does conform to the statute of frauds. Appellants, in turn, counter that the April 3, 2002 contract was executed without consideration.

Initially, the trial court awarded appellees summary judgment on appellants' breach of contract cause of action without specifying its grounds. In response to a motion from appellants requesting clarification of the scope of the ruling, the trial court issued an order concluding as follows:

> [Appellants] argued that several documents and representations that pre-date the April 2002 award letters, when con-
> sidered together, contractually obligate defendants to make last man standing payments. The court concludes as a matter of law that those documents and representations do not create a valid, enforceable contract between [appellants] and [appellees] obligating [appellees] to make last man standing payments. The court further concludes that the 2002 award letters are valid, enforceable agreements between [appellees] and the [appellants] that signed the agreements.

Subsequently, after the parties completed discovery, the trial court granted a motion to reconsider its earlier summary judgment rulings. The trial court's final summary judgment grants summary judgment without specifying its reasoning, but incorporates its earlier partial summary judgment rulings. We agree with the trial court's determination and its reasoning for granting appellees' summary judgment on the breach of contract claim.

The statute of frauds prohibits enforcement of any agreement that cannot be performed within one year unless the agreement, or a memorandum of the agreement, is documented in a writing that contains all the material terms of the agreement and is signed by the person to be charged. *See* TEX. BUS. & COM.CODE ANN. § 26.01(a), (b)(6) (Vernon Supp.2006); *Cohen v. McCutchin,* 565 S.W.2d 230, 232 (Tex.1978). The writing must be complete within itself in every material detail and must contain all essential elements so the contract between the parties may be ascertained without resort to oral testimony. *Cohen,* 565 S.W.2d at 232. "A valid memoranda of the contract may consist of letters or telegrams signed by the party to be charged and addressed to his agent or the other party to the contract, or even to a third party not connected with the transac-

tion." *Adams v. Abbott*, 151 Tex. 601, 254 S.W.2d 78, 80 (1952).

 Whether an agreement falls within the statute of frauds is a question of law. *Bratcher v. Dozier*, 162 Tex. 319, 346 S.W.2d 795, 796 (1961). Contending that a contract is unenforceable under the statute of frauds is an affirmative defense. *See* Tex.R. Civ. P. 94. To obtain summary judgment on an affirmative defense, a defendant must plead and conclusively establish each element of an affirmative defense thereby rebutting the plaintiff's cause of action. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

 Because the contract appellants seek to enforce provides for services to be provided over a three-year period, with retention bonuses payable at the end of the second and third years, it is subject to the statute of frauds. *See Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex.1991) (oral employment agreement lasting eight-to-ten years unenforceable under statute of frauds). In order to show appellees were not entitled to summary judgment, appellants must have presented evidence to the trial court showing that appellees agreed to make a final distribution and that appellees' agreement is in writing and signed by appellees' representative. *See Henriquez v. Cemex Mgmt., Inc.*, 177 S.W.3d 241, 249 (Tex.App.-Houston [1st Dist.] 2005, pet. denied).

In the trial court, appellants pleaded, "[a] combination of the oral promises, presentations, and writings in February, March, and April 2001 created a $169 million retention program contract between Efficient and those employees who continued their employment with Efficient." In their summary judgment response, appellants identified seven documents as establishing their contract: the February 2, 2001 proposal from Koch and Moran;

Memphis Acquisition's tender offer to purchase Efficient; Schedule I to the merger agreement; slides from Brooks's March 7, 2001 PowerPoint presentation; Floyd's March 8, 2001 letter describing the proposed retention plan; Floyd's March 30, 2001 email to Siemens' executives regarding the DRP rules; and the DRP plan analysis. In their brief on appeal, appellants contend three documents presented in their summary judgment evidence comprise the necessary agreement to constitute an enforceable contract: (1) Floyd's March 8, 2001 letter; (2) Floyd's March 30, 2001 email; and (3) Floyd's April 30, 2001 email to McMillen announcing Koch's acceptance of the proposed DRP plan. In their reply brief, appellants again rely upon Floyd's letter and two emails, but also identify six additional documents that, among others, "evidence the essential elements of the agreements between each of the [appellants] and Siemens." These documents are (1) Schedule I to the Agreement and Plan of Merger; (2) Brooks's slide showing a third-year payout; (3) the DRP Plan Analysis; (4) the email chain between Floyd and Hamilton over the period of February 25, 2002 and March 5, 2002; (5) a March 6, 2002 email from Hamilton to McMillen explaining that Efficient's employees were expecting a final distribution; and (6) a May 30, 2002 email from Brooks to McMillen stating the unallocated money was to be paid out at the end of the third year.

Regardless of whether we focus upon three, seven, or nine documents, appellants' contract claim does not satisfy the statute of frauds. Most of the documents appellants rely upon are not signed by the parties they seek to charge. The documents that are signed, Koch and Moran's February 2, 2001 proposal, the merger agreement with Schedule I attached, and Floyd's March 8, 2001 letter, do not pro-

vide for a "last man standing" final distribution.

Moreover, the signed documents contain language indicating they were not intended as final contractual agreements. Koch and Moran's letter is described as a "proposal." The "proposed" DRP and MRP is "outlined" in the addendum to the letter. The letter describes the proposed retention plan as "an initial proposal. . . . [W]e look forward to receiving input from Efficient Network's management to create a program we believe will be effective." The letter suggests Siemens and Efficient begin negotiations on an employee retention program. Finally, the letter states that "this letter shall not be deemed to be binding on any party." Section 10.04 of the Merger Agreement states that it is binding and inures to the benefit only of the signing parties. Section 10.04 expressly disclaims that the agreement confers "any right, benefit or remedy of any nature whatsoever" upon third parties. Floyd's March 8, 2001 letter, distributed to each DRP participant, provides "brief summaries" of the proposed retention programs. The letter states each participant's DRP award allocated to the participant and states that "[f]ormal plan documents incorporating the terms and conditions, and other provisions, will have to be adopted for these programs after the merger." The letter continues that Floyd "will be communicating with you in more detail as the transaction progresses, but we wanted to take this early opportunity to advise you of these programs." Attachment 2 to Floyd's letter, summarizing the DRP program, states that the participants would receive award letters explaining the "target incentive amounts designated for him or her under the DRP." Attachment 2 further states that the participant would receive his or her maximum amount "if the applicable individual and company performance measures are achieved." Finally, we note attachment 2 states that the "DRP will terminate as to new awards on the third anniversary" without addressing what will happen to unallocated money.

Additionally, even if we could consider the additional, unsigned documents appellants point to, there is no document or combination of documents that specifies how the "last man standing" payment would be distributed among the employees. *See id.* at 249–50 (concluding parol employment contract not provable through letters and visa application because documents did not contain sufficient language to provide definite term of employment). The necessity of a distribution term is demonstrated by evidence in the record showing appellants do not have the same understanding regarding how the last man standing payment was to be distributed. For example, in deposition testimony, Biko testified she understood the unallocated funds would be distributed, in some manner, to DRP participants. Kerry Stover testified Floyd promised the money would be divvied up equally among all employees, although he admitted some uncertainty whether that referred only to DRP participants or whether the money would be shared with all employees. Timothy Doll testified he believed Efficient management had discretion to pay the unallocated funds to any employee as long as all of the funds were allocated and paid out within three years. Although not a party to the litigation, Donald Ray Phillips, Efficient's director of financial reporting charged with maintaining the MRP/DRP schedule, averred in an affidavit that he understood the unallocated money would be divided in equal shares among all remaining employees. The only formula in the record for allocating a "last man standing" payment is contained in the revised contract at-

tached to the DRP analysis. There is no evidence that the revised contract was ever ratified by the Efficient board, signed by any party to be charged, or delivered to the appellants. Thus, it cannot provide the necessary missing term allocating the funds among employees. *See Baylor Univ. v. Sonnichsen,* 221 S.W.3d 632, 635 (Tex.2007) (per curiam) (preparing and signing draft contract that was never delivered to other party does not create enforceable contract due to absence of mutual assent). Without evidence establishing how to divide the $80 million amongst appellants and other employees, there is no basis for enforcement. *See Henriquez,* 177 S.W.3d at 249–50.

Appellants next contend their partial performance removes the alleged parol agreement from the requirements of the statute of frauds. Partial performance removes an oral agreement from the statute of frauds only if the performance is unequivocally referable to the agreement and corroborative of the fact that the contract was made. *Chevalier v. Lane's Inc.,* 147 Tex. 106, 213 S.W.2d 530, (1948). To take a parol contract out of the statute of frauds, the partial performance at issue "must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced...." *Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 439–40 (Tex.App.-Dallas 2002, pet. denied).

■ Appellants contend they partially performed the oral contract by working for a year before signing the award letters while appellees also partly performed by accruing $169 million for the retention plan, and paying the MRP. For their services, however, appellants received regular salaries and MRP payments. Thus, we cannot conclude their work was unequivocally referable and corroborative of a contract requiring a "last man standing" dis-

tribution. *See Chevalier,* 213 S.W.2d at 534 (opining that working for full term of alleged parol contract without compensation might be sufficiently referable to, and corroborative of, contract so as to remove it from statute of frauds); *Wiley v. Bertelsen,* 770 S.W.2d 878, 881–882 (Tex.App.-Texarkana 1989, no pet.) (holding plaintiff's receipt of monthly salary fully explained his work as ranch hand thus barring his bid to enforce oral agreement subject to statute of frauds on ground of partial performance). Likewise, appellees' accrual of the full potential $169 million payout and payment of the MRP is as corroborative of compliance with their ratified contract as with appellants' alleged parol agreement. *See Exxon,* 82 S.W.3d at 440 (concluding parol contract was unenforceable where partial performance consisted of services that could have been performed pursuant to a different contract). We conclude, as a matter of law, that appellants cannot meet the standard for establishing the partial performance exception to the statute of frauds. *See Wiley,* 770 S.W.2d at 881–82.

■ In addition to not satisfying the statute of frauds, appellants cannot surmount their execution of a contract at odds with their alleged parol contract. All appellants except Biko signed April 3, 2002 award letters. Each April 3, 2002 award letter and its incorporated retention contract acknowledges that the retention contract controls the distribution of the DRP funds and establishes the signatory's right to a DRP award. The retention contract contains a merger clause stating that the retention contract expressly "supercedes *any and all prior retention arrangements, programs or plans previously offered by* [Efficient.]"

By entering into an unambiguous agreement with a merger clause, the signing appellants have foreclosed their reliance

on prior agreements and their use of parol evidence to contradict the agreement's objective language. *See COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 666 (Tex. App.-Dallas 2004, pet. denied). By signing the award letters and accepting the considerable financial awards offered therein, appellants affirmed the contracts and agreed to be bound by them. *See Daniel v. Goesl,* 161 Tex. 490, 341 S.W.2d 892, 895 (1960); *see also Cordero v. Tenet Healthcare Corp.*, 226 S.W.3d 747, 750 (Tex.App.-Dallas 2007, pet. denied) (accepting benefits of contract after discovering alleged fraud is ratification of agreement).

Appellants assert the award letters do not address the issue of final distribution, were executed without consideration, and were drawn up after the fact to cover up appellees' failure to abide by their obligations to make the final distribution. All of appellants' counter arguments presuppose that there is some provable obligation to make a final distribution. Because appellants cannot prove their entitlement to a final distribution, the award letters are not incomplete for omitting such an obligation, the DRP awards constitute ample consideration for their execution, and the letters reflect the parties' enforceable agreement.

Except for Biko, each appellant entered into an express, written contract with Efficient setting forth the parties' agreement to the DRP plans as written. The written DRP contracts do not provide for a final distribution as described by appellants. For all appellants, including Biko, there is no document or set of documents, signed by the parties to be charged, that contains the necessary terms of a contract to provide a final distribution of the unallocated funds. Thus, we conclude the trial court did not err in granting summary judgment on appellants' breach of contract cause of action on the grounds appellants do not

have a valid, enforceable contract requiring a "last man standing" payment and the April 3, 2002 award letters are valid and enforceable contracts between the signing parties. Accordingly, we overrule appellants' third issue.

In their second issue, appellants contend summary judgment should be reversed because fact issues exist on their fraud claim. In the trial court, appellants pleaded that Floyd and other representatives of Efficient and Siemens ICN "made repeated and consistent representations to [appellants] on the payment terms of the DRP and 'last man standing' that constituted material misrepresentations. These misrepresentations related to the setting of individual goals, the setting of corporate goals, the allocation of $169 million, and the existence of 'last man standing.' " Appellants accused appellees of both misrepresenting elements of the retention plans and omitting to disclose "that they never intended to pay out all $169 million set aside for the retention program which include among other things, 'last man standing' payments." As a result of the misrepresentations and failure to disclose, appellants alleged they suffered "damages in an amount to be determined at trial."

To support their contentions, appellants point to deposition testimony from Brooks and Manning agreeing that the employees reasonably relied upon Efficient's officers' representations. Appellants contend there is a fact question regarding whether appellees owe them additional sums under the retention program. Among other responses, appellees assert appellants' fraud claims are derivative of their unenforceable breach-of-contract cause of action.

■■■ We have already upheld the trial court's summary judgment on appellants' breach-of-contract claim on the ground the asserted contract violates the statute of frauds. Appellants may not recover in a

fraud action benefit-of-the-bargain damages not otherwise enforceable under the statute of frauds. *See Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex.2001). A party cannot "use a fraud claim essentially to enforce a contract the Statute makes unenforceable." *Id.* A claimant may, however, recover out-of-pocket damages. *Id.*

■ Direct damages for common law fraud may include out-of-pocket damages and benefit-of-the-bargain damages. *Sonnichsen*, 221 S.W.3d at 636. Out-of-pocket damages are restitutionary and measure the difference between value parted with and value received. *Id.* Benefit-of-the-bargain damages derive from an expectancy theory and measure the difference between the value that was represented and the value actually received. *Id.*

Appellants' alleged damages all arise from appellees' refusal to make the final distribution appellants allege they are owed. Appellants essentially argue they were damaged because they did not get the benefits they expected when appellees did not honor their contract. Thus, appellants' fraud claim seeks benefit-of-the-bargain damages. *See id.* Because we view appellants' fraud claims as artfully pleaded claims for breach of contract, unenforceable under the Statute of Frauds, we follow *Haase* and *Sonnichsen* and overrule appellants' second issue. *See Sonnichsen*, 221 S.W.3d at 636–37; *Haase*, 62 S.W.3d at 799.

■ In their first issue, appellants contend summary judgment should be reversed because fact issues exist on their claim that appellees breached Efficient's 1999 Stock Plan. Initially, we note appellants concede that four appellants—Massey, Schmertz, Ladson, and Mason—were not participants in the Stock Plan and, therefore, have no claim to assert. Additionally, appellees point out fourteen appellants signed written releases when they left Efficient waiving any claims under the Stock Plan. Because we conclude the trial court did not err in granting summary judgment against all appellants asserting a cause of action for breach of the Stock Plan, we need not address the issue of individual waivers.

The Stock Plan empowered Efficient's board of directors, or a committee appointed by the board, the discretion to select employees who would receive stock options, to determine the number of optioned shares and the exercise price, and to set the time for the options to vest. Efficient and each optionee would enter into a "Stock Plan Agreement" setting forth the optionee's number of options, strike price, and vesting date. By signing the Stock Option Agreement, the optionee agreed that the option was governed by the Stock Plan and the optionee accepted "as binding, conclusive and final, all decisions or interpretations of the Administrator upon any questions relating to the Plan and Option Agreement."

In the event of a merger, section 13(c) of the Stock Plan required the successor entity to either assume the outstanding options or substitute "an equivalent option or right." Appellees contend they assumed and canceled the stock options in accordance with the Stock Plan's requirements. Appellants contend appellees did neither and, therefore, breached the Stock Plan. In the event appellees did assume and cancel the underwater options, appellants contend appellees breached the Stock Plan by failing to secure their consent before impairing their rights and terminating the plan.

Appellants contend appellees could not have assumed the options because one cannot assume an obligation by canceling it. Alternatively, appellants contend using the word "assume" to mean "cancel" renders

the term ambiguous, thus creating a fact issue regarding the wording of the Stock Plan. Appellants interpret the evidence as showing Efficient initially elected to substitute the retention plan as an "equivalent right" to the Stock Plan. Appellants point to Manning's deposition testimony stating that the $169 million figure was calculated by valuing the underwater options at $18 each and multiplying by the number of outstanding underwater options. Citing authorities establishing that unvested underwater options have value up to the date they expire, appellants contend fact issues exist regarding the value of the underwater options.

Appellants further point out that Floyd, other Efficient officers, and Efficient's outside accountants used the terms "substitute" and "replace" in describing the relationship between the retention plan and the Stock Plan. Thus, appellants contend, there is a fact issue regarding whether appellees intended to substitute the retention plan as an equivalent right to appellants' stock options. Appellants point to evidence showing Efficient's management told employees that unallocated retention funds would be distributed to them on the third anniversary of the merger. Subsequently, appellants allege, appellees altered the plan to retain the final distribution for themselves and ordered Efficient officers not to discuss the retention plan with the employees. By failing to pay out the full amount, appellants contend, there is a fact issue regarding whether appellees breached the Stock Plan's requirement that they provide an equivalent right. In making their argument, appellants ignore the plain wording of the Stock Plan and the evidence that appellees did assume the options obligation in accordance with the contract.

In the trial court, appellees took the position that they had assumed the outstanding stock options and paid at the time of the merger those that were "in the money." Appellees point to the minutes from a February 21, 2001 meeting of the Efficient Board of Directors wherein the Board pronounced that "for purposes of [Efficient's] stock option plans, the provisions of Section 3.07 of the Merger Agreement 'shall be considered an assumption' of [Efficient's] options." Section 3.07 of the Merger Agreement, in turn, states as follows:

SECTION 3.07 *Employee Stock Options; Employee Stock Purchase Plan.* (a) Effective as of the Effective Time, the Company shall take all necessary action, including obtaining the consent of the individual option holders, if necessary, to (I) cancel the Company's 1999 Stock Plan ... and (ii) cancel, at the Effective Time, each outstanding option to purchase shares of Company Common Stock (each, a *"Company Stock Option"*) that is outstanding and unexercised, whether or not vested and exercisable as of such date. Each holder of any cancelled Company Stock Option that has an exercise price that is less than the Per Share Amount shall be entitled (subject to the provisions set forth in this Section 3.07(a)) to be paid by the Surviving Corporation, with respect to each share subject to the Company Stock Option, an amount in cash (subject to any applicable withholding taxes) equal to the excess, if any, of the Per Share Amount over the applicable exercise price of such Option (the *"Option Payment"*). In respect of those Company Stock Options that have an exercise price that is less than the Per Share Amount, the Surviving Corporation shall make each Option Payment to the Company Stock Option holder as of the date on which the applicable number of shares of Common Stock subject to such Company Stock Option would

have otherwise vested, subject to the conditions for vesting contained in the applicable Company Stock Option award, notwithstanding the cancellation of such Company Stock Option. The Surviving Corporation shall make such Option Payment at the Effective Time with respect to any outstanding and fully vested Company Stock Options that have an exercise price that is less than the Per Share Amount as of such date....

(b) The Company shall take all actions necessary to shorten any pending Offering Period (as such term is defined in the Company's 1999 Employee Stock Option Purchase Plan (the *"ESPP"*)) and establish a New Exercise Date (as contemplated in Section 19(c) of the ESPP) prior to the Effective Time (the *"ESPP Date"*). After the ESPP Date, all offering and purchase periods pending under the ESPP shall be terminated and no new offering or purchasing periods shall be commenced.

The record shows Efficient elected to assume and cancel the outstanding options in accordance with section 3.07 of the merger agreement. In the event of a merger, the 1999 Stock Plan provided that an option would be considered assumed "if, following the merger ... the option or right confers the right to purchase or receive, for each Share of Optioned Stock subject to the Option or Stock Purchase Right immediately prior to the merger ... the consideration ... received in the merger ... by holders of Common Stock for each Share held on the effective date of the transaction...."

The first official communication regarding the merger, Koch and Moran's February 2, 2001 letter, proposed that the "in the money" options be paid and canceled. The Koch/Moran letter proposed that employees be compensated for their "out of the money" options by including them in the MRP, which was expressly intended to reward them in lieu of stock options. The parties do not dispute that the MRP was paid.

Despite the Efficient Board's pre-merger pronouncement that the stock options were assumed, appellants contend there was no assumption because the Stock Plan required the successor entity to make the assumption and there is no evidence the new Efficient ever expressly assumed the options. Appellants, however, ignore the import of the Efficient Board's declaration in the February 21, 2001 minutes. Section 2(a) of the Stock Plan named the Board as the Stock Plan "administrator." Among the enumerated powers of the administrator listed in section 4(b)(viii) of the Stock Plan is the power "to construe and interpret the terms of the Plan and awards granted pursuant to the Plan." Section 4(c) provided that "[t]he Administrator's decisions, determinations and interpretations shall be final and binding on all Optionees and any other holders of Options or Stock Purchase Rights." Section 4(c) is in harmony with the Stock Option Agreements which require each signing optionee to expressly acknowledge that the decisions and interpretations of the administrator was "binding, conclusive and final."

■ If a written instrument is worded so that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and we will construe the contract as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). Under the unambiguous language of the Stock Plan, the Board's determination that section 3.07 of the Merger Agreement satisfied the assumption requirement of the Stock Plan is final and binding upon appellants.

Moreover, as appellees point out, upon closing of the merger transaction, appellees, acting as the "successor corporation," actually paid "the consideration ... received in the merger or sale of assets by holders of Common Stock" as required by section 13(c) of the Stock Plan. It is undisputed that the "in the money" options, including those held by appellants, were paid at the time of the merger by giving the option holders the difference between the $23.50 per share tender price (the "Per Share Amount" described in the Merger Agreement) and the strike price of the option. Thus, having satisfied the consideration requirement of section 13(c), under the terms of that section, we conclude appellees assumed the options as a matter of law.

We also find no merit in appellants' efforts to value the "underwater" options. The Stock Plan unambiguously requires the successor company to provide only the consideration available to common stockholders. It is undisputed that Efficient's common-stock holders received $23.50 per share in the merger. Assuming, without deciding, that some residual value could be attributed to appellants' "underwater" options, section 13(c) does not require the merging entities to recognize or pay the residual value during the merger. Thus, the fact that "underwater" options exercisable at prices above the tender price were not compensated is irrelevant to a determination that appellees assumed and canceled the outstanding options in accordance with the Stock Plan.

Likewise, we find no fact issue in appellants' contention regarding Efficient's officers describing the retention plan as a "substitute" for the stock options when describing the retention plan to employees. As appellants state in their brief, the evidence shows Siemens Corporation's inability to offer employees stock options as an incentive was a significant hurdle to merging Efficient into the Siemens group. The fact that the retention plans were widely viewed by Efficient's employees and managers alike as a pragmatic substitute for the Stock Plan does not alter or affect the fact that it was not a "substitute" within the meaning of section 13(c) of the Stock Plan. Section 13(c) does not require in the event of a merger that appellees compensate optionees for underwater options.

Reinforcing the evidence that the retention plan was intended to replace the Stock Plan only as a business necessity rather than as a matter of fulfilling the Stock Plan's notion of an "equivalent right," we observe that the MRP was available to all employees—not just to those holding underwater options. Similarly, the DRP bonuses were awarded to key employees— not just employees holding underwater options. Without evidence directly correlating underwater options and the awards under the retention plan, appellants cannot show appellees elected to provide an "equivalent right."

Turning to appellants' alternative argument, the Stock Plan provided that the optionee's rights may not be impaired by amendments, alterations, suspensions or termination of the plan unless agreed in writing. Appellants contend appellees impaired their rights and terminated the Stock Plan without first acquiring their written consent, thus breaching the Stock Plan. Appellees respond that the optionees' rights were not impaired by an assumption carried out in conformity to the contract.

 In reviewing the Stock Plan, we must examine and consider the entire contract in order to harmonize and give effect to all provisions so none are rendered meaningless. *Id.* By entering into the Stock Plan agreement, the optionees have already consented to the merger-event procedure set down in the contract.

We agree with appellees that it does not impair appellants' rights nor does it require additional consent for appellees to conduct a merger in accordance with the merger event clause of the Stock Plan.

Because the record shows appellees properly assumed and canceled the options in accordance with the Stock Plan's merger-event provision, we conclude there is no genuine issue of material fact, and they were entitled to judgment as a matter of law on appellants' claim for breach of the Stock Plan. We overrule appellant's first issue.

We affirm the trial court's judgment.