John A. CARBONA, Appellant/Cross–Appellee

v.

CH MEDICAL, INC. and CH Industries, Inc., Appellees/Cross–Appellants.

No. 05–06–01417–CV.

Court of Appeals of Texas, Dallas.

Oct. 23, 2008.

Rehearing Overruled Dec. 10, 2008.

Deborah G. Hankinson and Rick Thompson, Law Offices of Deborah Hankinson, PC, Dallas, TX, for Appellant.

Paul W. Brown, Law Offices of Paul W. Brown PC, Dallas, TX, for Appellee.

Before Justices WHITTINGTON, RICHTER, and MAZZANT.

## OPINION

Opinion by Justice MAZZANT.

This case concerns the compensation due John A. Carbona, the chief executive officer of CH Medical, Inc. and a director of CH Industries, Inc., following the sale of the assets of C.H. Medical. After a jury trial, the trial court rendered judgment on the jury's breach of contract findings against Carbona but not on the jury's breach of fiduciary duty findings against Carbona. Carbona brings five issues asserting the trial court erred in rendering judgment on the jury's breach of contract findings, and CH Medical and CH Indus-

tries bring three cross-issues challenging the trial court's failure to render judgment on the jury's breach of fiduciary duty findings. We reverse in part and render judgment reducing the award of damages to CH Medical and CH Industries, we render judgment for Carbona on his claim for breach of contract, and we remand the cause to the trial court for further proceedings.

## BACKGROUND

Charles Hasty was the sole shareholder of CH Industries, which owned two businesses, a sheet metal company called Humanetics, II and a business that manufactured, sold, and leased hospital beds called CH Medical. During the operation of the businesses, Humanetics loaned CH Medical $7,620,463. Carbona was a salesman for CH Medical, and in the early 1990s, Hasty promoted Carbona to president of CH Medical.

In 1995, Carbona signed an Employment Agreement appointing him chief executive officer of CH Medical, Inc. and director of CH Medical's sole shareholder, CH Industries, Inc. Besides setting forth the terms of employment, salary, and incentive bonuses, the Employment Agreement provided Carbona with "Phantom Stock Rights." The Phantom Stock Rights were the right to some of the economic benefits of stock ownership of twenty-five percent of CH Medical without CH Medical having to issue the shares. In the event of a sale of CH Medical, Carbona would receive money equal to his Phantom Stock Rights, which would "equal the value of twenty-five percent (25%) of the shares of CH Medical, Inc. outstanding immediately before the Sale event (such value measured immediately after consummation of a Sale Event)." The incentive bonus provisions were applied retroactively, and the bonuses Carbona would have earned before he signed the contract were treated as loans to the companies. The Employment Agreement was guaranteed by CH Medical, CH Industries, and Hasty.

In 1998, MEDIQ/PRN Life Support Services, Inc. (Mediq) offered $47.5 million for the assets of CH Medical, and CH Medical, CH Industries, and Hasty accepted. This amount included $20 million for patents owned by Hasty and Carbona and $500,000 as consideration for non-compete agreements ($250,000 each to Hasty and Carbona). The assets Mediq agreed to purchase included the inventory of hospital beds and CH Medical's accounts receivable from Medicaid. Mediq had the right to demand an adjustment of the purchase if the receivables or other assets were not as represented.

One of the conditions of the sale was the termination of Carbona's Employment Agreement. To compensate Carbona for his Phantom Stock Rights, Carbona, Hasty, CH Medical, and CH Industries entered into an agreement to pay Carbona a series of "bonuses." The terms of this Bonus Agreement, signed on May 28, 1998, superseded any inconsistent terms of the Employment Agreement. Under the Bonus Agreement, Carbona would receive an amount of money calculated by a formula set forth in the agreement. Additionally, Carbona would receive fifty percent of any amount of the sale that exceeded $24.7 million after various deductions and adjustments. Following the sale, Carbona initially received more than $10 million: $5 million for his patent, $250,000 for the non-compete agreement, and $4,940,265 under the formula in the Bonus Agreement.

The Bonus Agreement set forth two relevant sets of payments to Carbona. The first was the "At Closing" Bonus of the amount under the formula paid to Carbona at the closing. Exhibit B to the Bonus Agreement set forth the numbers to be

used in the initial calculation of the formula, and the agreement stated Carbona would be paid that amount, $4,940,265, at the closing. The second payment was the "Ninety Days After Closing" Bonus: ninety days after closing, the parties would recalculate the At Closing Bonus using the same formula and the more correct numbers then available; if the recalculation showed Carbona was owed money, he would receive it, and if it showed the At Closing Bonus was too high, he would refund the overpayment. Additionally, as part of the Ninety Days after Closing Bonus, Carbona would pay one-fourth of any post-closing expenses and would be paid for any incentive bonuses earned under the Employment Agreement before its termination at the closing of the sale. At the ninety-day point, the parties were also to agree to a reasonable estimation of future expenses, and Carbona was to pay twenty-five percent of that amount. To guarantee that money from the sale would be available if there was money owed to Carbona, the companies set aside one million dollars from the sale.

The closing of the sale of CH Medical to Mediq took place on May 29, 1998, and Carbona received the At Closing Bonus of $4,940,265. Problems quickly arose as some of the inventory could not be located and questions arose concerning the validity of some of the Medicaid receivables. Mediq demanded an adjustment of the purchase price pursuant to the Asset Purchase Agreement. These issues were not finally resolved until CH Medical and Mediq had entered into two settlement agreements, the first in March 1999 and the second in June 2000. Other problems included lawsuits brought by three former employees of the companies based on alleged misrepresentations by Carbona about the sale. These and other problems extended well beyond ninety days after the sale, and Carbona and CH Medical could

not follow the Bonus Agreement's "Ninety–Day Bonus" provisions because they lacked the final numbers to enter into the formula, and no reasonable estimation of post-closing expenses was possible.

As part of the closing, Carbona signed an agreement terminating the Employment Agreement. However, Carbona remained president and chief executive officer of the companies until he resigned on August 31, 1999.

During the winding down of CH Medical, Hasty became concerned that there was not as much money after the sale as he had anticipated. Hasty believed the shortfall was due to the fact that Carbona's calculation of his share of the sale proceeds under the formula in the Bonus Agreement had not included the $7,620,463 intercompany liability of CH Medical to Humanetics. In 2002, CH Medical and CH Industries sued Carbona for breach of contract, fraud, and breach of fiduciary duty, asserting Carbona's failure to include the debt to Humanetics in the calculations of his share of the sale proceeds resulted in Carbona's receiving too much money from the sale of CH Medical. The companies also alleged Carbona breached the contract by failing to pay his share of the post-closing expenses. Carbona filed a counterclaim for an incentive bonus he had earned under the Employment Agreement before the sale of CH Medical. The trial court concluded the contracts were ambiguous and submitted their interpretation to the jury.

Concerning the interpretation of the various agreements, the jury found that under the Bonus Agreement's formula for calculating Carbona's share of the sale proceeds, Carbona and the companies did not agree "to exclude intercompany payables owed to Humanetics, II, if any, from the total amount of corporate liabilities to

be deducted from the total amount of corporate assets of CH Medical, Inc. and its subsidiaries in calculating Carbona's 25% share of the sale proceeds."

On the companies' causes of action, the jury found Carbona breached the Bonus Agreement by not including the liability to Humanetics in the calculation of the At Closing Bonus. The jury also found he breached his fiduciary duty to the companies and committed fraud. The court submitted a single damages issue on breach of contract, breach of fiduciary duty, and fraud, and the jury determined Carbona received $1,427,000 in excess of his twenty-five percent share of the sale proceeds. The jury also found Carbona breached the Bonus Agreement by not paying his one-fourth share of the post-closing expenses, which the jury found amounted to $796,000. The trial court's judgment awarded the companies $2,223,000 for

breach of contract, rendered a take-nothing judgment on the companies' fraud and breach-of-fiduciary-duty claims, and rendered a take-nothing judgment on Carbona's breach of contract claim. The court also awarded the companies their attorney's fees.

## BREACH OF CONTRACT

■ In his first issue, Carbona asserts he did not breach the Bonus Agreement in his calculation of the At Closing bonus. The parties' dispute concerns the place of the $7,620,463 intercompany liability of CH Medical to Humanetics in the distribution of the sale proceeds.

The Bonus Agreement set out the formula to calculate Carbona's share of the sale proceeds, and Exhibit B to the agreement set out the numbers to be used in the initial calculation of the amount to be paid to Carbona at the closing.[1] The intercom-

---

1. The formula set forth in paragraph 2 of the Bonus Agreement provided:

   2. *The "At Closing" Bonus.* The "At Closing" Bonus shall equal Item (vii) herein (herein the "At Closing" Bonus) below and shall be paid at Closing by [CH Medical] to Carbona and shall be determined based on the February 28, 1998 carve out statement for [CH Medical], attached hereto as Exhibit "A" (the "February 28, 1998 Carve Out Statement"). Based on the following formula, the bonus to be paid at Closing is $4,940,265 as set forth on Exhibit "B" attached hereto

   (i) Gross Proceeds of Sale of $47,500,000 (less the $20,300,000 to be paid for the Patents and the $250,000 paid for covenants not to compete) less $2,500,000 to be held by Compass Bank to fund the "Twenty Days After Closing" bonus pursuant to Paragraph 3 hereof, and less $1,000,000 to be held by [CH Medical] pending a Closing Date accounting and which will fund the "Ninety Days after Closing" Bonus Pursuant to Paragraph 4 of this Agreement, and less $2,500,000 to be held by Chase Manhattan Trust pursuant to Paragraph 3 hereof, or $20,950,000.

   MINUS:
     (a) Accounts Payables
     (b) Other A/P* * *
     (c) Accrued Payroll and Payroll Taxes
     (d) Note Payable*
     (e) Loan from Carbona/Unaccrued Compensation Carbona* *
     (f) Unaccrued interest on amounts owed on Carbona loans
   MINUS:
     (g) Adjusted tax basis of assets sold
   * These are loans from compensation accrued and paid to Carbona and lent back
   * * These are loans from Carbona that were not accrued as compensation or reported by Carbona as compensation.
   * * * Exclusive of the BGI Settlement
   (ii) The corporate tax liability of [CH Medical] is calculated as if it were not part of an affiliated group, taking into consideration any tax deposits or other credits.
   (iii) Outstanding balance on the Line of Credit at Compass Bank
     REDUCED BY:
     (a) $1,500,000
     (b) The amount of (b) reflected as a shareholder A/R (including loans to James Hasty)
     (c) The amount of (b) reflected as CH Leasing II Ltd. A/R

pany liability was not included in Exhibit B's figures used to calculate Carbona's At Closing bonus. CH Medical asserts this liability should have been part of the calculation under the formula. CH Medical's accounting witnesses testified that General Accepted Accounting Principles (GAAP) applied to the Bonus Agreement and, under GAAP, the intercompany liability was an accounts payable. Carbona argues the contract is clear that it was not to be included in the formula because it is not listed there and is not included in the numbers applied in the formula as set out in Exhibit B. The trial court concluded the contract was ambiguous on the issue of the intercompany liability and submitted to the jury whether, under the Bonus Agreement, the parties agreed to exclude the intercompany liability from the calculations of the value of Carbona's twenty-five percent share of the sale proceeds. The jury found the parties did not agree to exclude the intercompany liability from that calculation.

Carbona argues the trial court erred in concluding the parties' agreements were ambiguous and submitting their interpretation to the jury. He also asserts the

agreements should be interpreted as a matter of law and that such an interpretation would establish that Carbona did not breach the contract by failing to include the intercompany liability in the formula.

■■■ In construing a written agreement, we must ascertain and give effect to the parties' intentions as expressed in the agreement. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex.2005) (per curiam); *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 55 (Tex.App.-Dallas 2006, pet. denied). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank*, 165 S.W.3d at 312; *Hackberry Creek Country Club, Inc.*, 205 S.W.3d at 55–56. If the agreement is susceptible to more than one reasonable interpretation, it is ambiguous. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex.2006); *Hackberry Creek Country Club, Inc.*, 205 S.W.3d at 56. Whether an agreement is ambiguous is a question of law. *In re D. Wilson*

---

(d) The amount of (b) reflected as CH Realty II Ltd. A/R
(e) The amount of (b) reflected as CH Realty Ltd. A/R
(f) The amount of (b) reflected as CH Leasing Ltd. A/R
INCREASED BY:
(g) The amount owed to CH Leasing II, Ltd.
(h) The amount owed to CH Realty II, Ltd.
(i) The amount owed to CH Leasing Ltd.
(j) The amount owed to CH Realty, Ltd.
(k) The amount of advances from shareholder
(iv) The outstanding balance of BGI Settlement divided by $250,000 and then multiplied by $100,000
(v) [Items (i) minus Items (ii), (iii) and (iv)] multiplied by 25%
(vi) The result from (v) multiplied by 80%
(vii) The result from (vi) multiplied by 1.6556

Exhibit B of the Bonus Agreement provided the numbers to be used in the formula at the time of the closing to calculate Carbona's share of the sale proceeds:
(i) $20,950,000
MINUS:
  (a) $ 558,677
  (b) $ 756,889
  (c) $ 551,918
  (d) $ 62,609
  (e) $ 460,000
  (f) $ 271,290
MINUS:
  (g) $16,868,088
  (ii) $ 2,594,850
  (iii) $ 705,103
  (iv) $ 68,800
  (v) $ 3,729,966
  (vi) $ 2,983,373
  (vii) *$ 4,940,265*

*Constr. Co.,* 196 S.W.3d 774, 781 (Tex.2006) (orig.proceeding). The ambiguity must be evident by examining the document itself; it cannot be created by considering parol evidence of the parties' intent. *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 747 (Tex.2006); *Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 283 (Tex. 1996) (per curiam). If the agreement is not ambiguous, and therefore is not susceptible to more than one reasonable interpretation, then the courts do not consider extrinsic evidence in interpreting the agreement. *Fiess,* 202 S.W.3d at 747; *Friendswood Dev. Co.,* 926 S.W.2d at 283. If a contract is not ambiguous, we will construe it as a matter of law. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *Biko v. Siemens Corp.,* 246 S.W.3d 148, 165 (Tex.App.-Dallas 2007, pet. denied).

Having reviewed the Bonus Agreement, we conclude it is not ambiguous. As Carbona argues, the contract specifically set forth the amount of the sale proceeds Carbona was to receive at the closing: "Based on the following formula, the bonus to be paid at Closing is $4,940,265 as set forth on Exhibit 'B' attached hereto." Exhibit B plainly did not include the $7,620,463 liability to Humanetics. Carbona received the bonus of $4,940,264 based on the formula at the closing, just as the contract specified. The companies argue the liability should have been included in the formula as part of "Accounts Payable" or "Other AP"; however, Exhibit B defined the numbers used in the formula, and the numbers for "Accounts Payable," $558,644, and "Other AP," $756,889, clearly do not include the Humanetics liability.

Considering the parties' entire agreement and harmonizing and giving effect to all its provisions, we conclude the agreement was unambiguous concerning the place of the debt to Humanetics in Carbona's calculation of his share of the sale proceeds—the debt was not part of that calculation. As a matter of law, Carbona's failure to include CH Medical's liability to Humanetics in calculating his share of the sale proceeds did not breach the Bonus Agreement. We sustain Carbona's first issue.

In his second issue, Carbona asserts there is no evidence to support the jury's finding of damages from his failure to include the intercompany liability in the calculation of his share of the sale proceeds. Carbona argues the expert testimony supporting the award of damages was speculative and unreliable and the exhibits offered in support were based on the wrong contract. Because we have concluded that Carbona, as a matter of law, did not breach the Bonus Agreement by failing to include the intercompany liability in the calculation of his share of the sale proceeds, we need not address Carbona's arguments on this issue.

## FRAUD AND BREACH OF FIDUCIARY DUTY

In their first and second cross issues, the companies contend the trial court erred in not rendering judgment that Carbona was liable for fraud and breach of fiduciary duty. The companies' counterclaims alleged Carbona committed fraud and breach of fiduciary duty by not including the intercompany liability in the calculations under the formula determining Carbona's share of the sale proceeds. The companies assert Carbona "removed all reference to intercompany debt from the May 28, 1998 Agreement [the Bonus Agreement] and did not disclose to CHM [CH Medical] and Hasty that it was not included in the calculation." They argue that the inclusion of the categories of "Accounts Payable" and "Other AP" in the formula were included to lead appellees

into believing that the debt to Humanetics was included in the calculation.

■ Carbona moved for judgment notwithstanding the verdict on the companies' fraud and breach of fiduciary duty claims arguing they were not independent of their breach of contract claims and that there was no evidence of any misrepresentation by Carbona. We affirm a trial judge's decision to grant a judgment notwithstanding the jury's verdict if the evidence is legally insufficient to support one or more of the jury findings on issues necessary to liability. *Wal–Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex.2003) (per curiam). Evidence is legally insufficient where (1) there is a complete lack of evidence of a vital fact; (2) the factfinder is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Lochinvar Corp. v. Meyers*, 930 S.W.2d 182, 188 (Tex.App.-Dallas 1996, no writ). In a legal sufficiency review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005). We review the evidence and must credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 827; *see also Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001) (when party attacks legal sufficiency of adverse finding on issue on which it has burden of proof, party must demonstrate on appeal that evidence establishes, as matter of law, all vital facts in support of issue). *State v. Vavro*, 259 S.W.3d 377, 379 (Tex.App.-Dallas 2008, no pet.).

The companies assert there is evidence to support the jury's finding that Carbona failed to disclose the omission of the debt to the companies. We disagree because the Bonus Agreement disclosed that the debt was not included in the calculation under the formula. Exhibit B to the Bonus Agreement set forth the numbers to be used in the calculation of the formula. The figure for "Accounts Payable" was $558,677, and the figure for "Other AP" was $756,889. The debt to Humanetics, $7,620,463, was more than ten times either amount. Thus, the numbers in Exhibit B clearly demonstrated that the Humanetics liability was not included and could not have been included in either "Accounts Payable" or "Other AP." The only figures in Exhibit B large enough to include the Humanetics liability were the $20,950,000 amount for the proceeds of the sale to be divided pursuant to the formula and the $16,868,088 amount for "(g) Adjusted tax basis of assets sold," and the liability to Humanetics does not belong in either category.

Exhibit B to the Bonus Agreement disclosed to the companies that the $7,620,463 debt to Humanetics was not included in the calculation under the formula; accordingly, we conclude the trial court did not err in granting Carbona's motion for judgment notwithstanding the verdict on the companies' fraud and breach of fiduciary duty causes of action. We overrule the companies' first and second cross-issues.

## POST–CLOSING EXPENSES

■ In his third issue, Carbona contends no evidence supports the jury's award of $796,000 for his failing to comply with the Bonus Agreement's provisions concerning division of post-closing expenses. In reviewing the evidence, we "must consider evidence in the light most favorable to the verdict, and indulge every

reasonable inference that would support it." *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005). In doing so, we "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827.

Jury question 4 asked, "Do you find that John A. Carbona failed to comply with the May 28, 1998 Agreement by not paying 25% of post-closing expenses, if any?" The jury answered "Yes." In jury question 12, the jury determined that Carbona's share of the post-closing expenses was $796,000.[2] Carbona asserts, "When reviewed under proper no-evidence standard, however, it becomes clear that there is no evidence to support this award of damages. . . ." Carbona does not challenge the jury's finding in question 4 that he was required by the Bonus Agreement to pay twenty-five percent of the post-closing expenses and that he failed to do so.

In support of their claim for post-closing expenses, the companies presented in evidence voluminous documentation of the income and expenses between the closing of the Asset Purchase Agreement and Mediq and Hasty's final disposition of the companies—Plaintiffs' Exhibits 27A, B, C, and D.[3] They also presented exhibits summarizing the documentation. Plaintiffs' Exhibit 7 summarized the evidence of the post-closing expenses into sixty-four categories and five different periods: June 1998 to August 1998 ($1,849,004.30), June 1998 to March 1999 ($2,944,530.46), June 1998 to June 1999 ($3,127,369.24), June 1998 to August 1999 ($3,185,332.46),[4] and June 1998 to August 2003 ($3,785,996.62). The June 1998 to August 1999 amount of $3,185,332.46, when multiplied by twenty-five percent, equals $796,333.15 and is nearly identical to the jury's answer of $796,000 for Carbona's twenty-five percent share of post-closing expenses.

Carbona first argues Plaintiffs' Exhibit 7 is no evidence of the damages found by the jury because it "does not recalculate the At Closing Bonus using adjusted expenses

**2.** Jury question 12 provided,

> If you answered "Yes" to Question Number 4, then answer the following question. Otherwise, do not answer the following question.
> What sum of money, if any, paid now in cash would fairly and reasonably compensate CH Medical, Inc, C.H. Industries, Inc. and Cardio Systems Operations, Inc. for their damages, if any, that resulted from such failure to comply?
> Consider the following elements of damages, if any, and none other. Do not add any amount for interest on damages, if any.
> A.   John Carbona's share of the amount of corporate post closing expenses, if any.
> Answer in dollars and cents for damages, if any.
> Answer: $ _796,000_

**3.** At trial, the parties referred to Plaintiffs' Exhibits 27A–D as the "white books." On appeal, Carbona asserts, "One cannot tell from reviewing the white books whether any expense was actually incurred by CH Medical.

Any use of this data is questionable at best." (Record citation omitted). Appellant never asserted to the jury that the white books were questionable. Nor did he argue at any point during the years of litigation that they fail to show "whether any expense was actually incurred by CH Medical." Nor does he cite to any evidence in the record that the exhibits do not include documentation of the expenses incurred by CH Medical. Laurie Hasty, Hasty's daughter, testified she compiled the white books and that they documented all the post-closing deposits and expenditures of "the company." Although she never specifically stated "the company" was CH Medical, it is clear from the context of her testimony that CH Medical was "the company." When Carbona's counsel questioned Ms. Hasty about the white books, he elicited testimony that the white books included expenses from June 1998 through August 2003.

**4.** Carbona officially resigned in August 1999, so this period represents the time between the closing and Carbona's resignation.

'as of the date of closing' or agreed-upon future expenses. Nor does it credit the $1 million held back by CH Medical." Carbona's argument is based on paragraph 4 of the Bonus Agreement, the Ninety Days After Closing Bonus. That provision required the parties, ninety days after the closing, to recalculate the formula for the At Closing Bonus using the more up-to-date figures then available and the final sales price of the assets. In performing this recalculation, the sale proceeds would include the one million dollars withheld in the original At Closing Bonus calculation. The parties would also include in the recalculation "reasonable estimates of post Closing expenses plus an additional amount to be determined by the parties for future expenses, obligations or claims."[5] The jury, however, was not asked or instructed in questions 4 and 12 to perform the recalculation envisioned by paragraph 4 of the Bonus Agreement. Instead, the jury was asked in question 12 to determine Carbona's share of the post-closing expenses, which in question 4 it had determined was "25% of post-closing expenses." The "adjusted expenses 'as of the date of closing' or agreed-upon future expenses" and the "$1 million held back by CH Medical" were not relevant to this determination. Carbona's argument would

be better suited to a challenge to the language of the jury questions and their instructions for failing to set forth accurately his contractual obligations, but it is not relevant to a challenge of the jury's answer to the questions and instructions as worded.

Carbona also asserts post-closing expenses of $3,185,332 lacked justification because, in the sale to Mediq, "CH Medical had sold substantially all of its assets." "Substantially all," however, is not "all," and as the companies' witnesses testified, certain assets, such as the unsold receivables, took time to dispose of. Besides the assets, resolution of some of the remaining liabilities of the companies, such as the lawsuits brought by the three former employees, consumed substantial time and expense.

Carbona also argues the fifteen-month period of assessing post-closing expenses conflicts with the Bonus Agreement's language that "specifies the time period for the adjustment of expenses: *'Within 90 days after the Closing*, the amount calculated pursuant to the formula for determining the "At Closing" Bonus shall be recalculated as of the Closing Date.' " (Emphasis added by Carbona.) We dis-

---

**5.** Paragraph 4 of the Bonus Agreement provided,

> 4. *The "Ninety Days After Closing" Bonus.* The At Closing Bonus is based on February 28, 1998 Carve Out Statement which the parties acknowledge will change prior to Closing and for which $1,000,000 has been withheld by Cardio Systems with which to make such adjustments. Within ninety days after the Closing, the amount calculated pursuant to the formula for determining the "At Closing" Bonus shall be recalculated as of the Closing Date, accruing reasonable estimates of post Closing expenses plus an additional amount to be determined by the parties for future expenses, obligations or claims, (the "Additional Amount") and without withholding

the $1,000,000 of the gross proceeds of sale pursuant to Paragraph 2 hereof, and to the extent such recalculated amount result any additional about to Carbona, said difference shall be paid to Carbona by Cardio Systems on the 90th day following the Closing Date (herein, the "Ninety Days after Closing Bonus"). In the event following such recalculated amount paid to Carbona as his At Closing Bonus exceeds what he should have received, Carbona shall repay Cardio System the difference less any required withholdings remitted by Cardio Systems on the 90th day following the Closing Date. Timing and procedures for the disbursement of the Additional Amount shall be agreed upon Ninety (90) days after the Closing Date.

agree. That language does not limit the period of post-closing expenses to ninety days. That language means what it says: after ninety days, the formula will be recalculated. That language has nothing to do with limitation of post-closing expenses.

Carbona also argues there is no "justification in the contract to include 'all' post-closing expenses Plaintiffs chose to attribute to CH Medical. The language of the Ninety Days after Closing Bonus provision does not call for a recalculation of the At Closing Bonus based on such an adjustment. Rather, it provides for the parties to agree upon future expenses within 90 days of closing...." The issue on appeal, however, is the legal sufficiency of the evidence to support the jury's finding that $796,000 was the amount of Carbona's twenty-five percent share of the post-closing expenses. If the jury had been asked to determine the amount that ninety days after the closing would have been a reasonable estimation of post-closing expenses, then the argument would be relevant; however, that was not the question asked of the jury.

We conclude that Plaintiffs' Exhibits 7 and 27A–D constitute some evidence legally sufficient to support the jury's finding that $796,000 was the amount of Carbona's twenty-five percent share of the post-closing expenses. We overrule Carbona's third issue.

In his fourth issue, Carbona contends the jury's finding of $796,000 damages should be remitted because it is excessive. Carbona asserts "the damages should at least be reduced from $796,000 to $214,751."

█ "The standard of review for an excessive damages complaint is factual sufficiency of the evidence." *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998). Also, "an appellate court may not order a remittitur unless the evidence

supporting damages is factually insufficient." *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 851 (Tex.2000) (citing *Pope v. Moore,* 711 S.W.2d 622, 623 (Tex.1986)). In reviewing the factual sufficiency of the evidence to support a jury verdict, an appellate court considers and weighs all the evidence. *Dow Chem. Co.,* 46 S.W.3d at 242; *City of Princeton v. Abbott,* 792 S.W.2d 161, 163 (Tex.App.-Dallas 1990, writ denied). We do not find the evidence factually insufficient unless the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dow Chem. Co.,* 46 S.W.3d at 242; *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986).

Carbona argues the calculation the jury should have used to arrive at its answer to jury question 12 is the following:

| $1,859,004 | (operating expenses incurred 90 days after closing) |
| − $1,000,000 | ($1 million withheld from proceeds to cover expenses) |
| $ 859,004 | |
| × .25 | (Carbona's percentage of expenses) |
| $ 214,751 | |

The first part of Carbona's calculation is the limitation of post-closing expenses to ninety days after closing. In his brief, "Carbona suggests that the post-closing expenses incurred within the 90 days after the closing is a more reasonable period." However, Carbona provides no explanation for why ninety days is more reasonable than the fifteen months of expenses found by the jury. Nor does he explain why the fifteen months of post-closing expenses found by the jury is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.

Examination of the parties' agreements shows the parties agreed to divide the post-closing expenses beyond ninety days after closing. Paragraph 4 of the Bonus Agreement stated that ninety days after

closing, the parties would reperform the calculation under the formula in paragraph 2 and include in the formula "an additional amount to be determined by the parties for future expenses, obligations or claims." Because the recalculation is performed ninety days after closing, the "future expenses, obligations, or claims" were those incurred more than ninety days after closing. Furthermore, the Asset Purchase Agreement envisioned a continuing relationship between Mediq and CH Medical and CH Industries. The Asset Purchase Agreement gave Mediq ninety days from closing to prepare and deliver a Closing Statement listing any problems with the sale. The companies then had twenty days to protest the Closing Statement and another twenty days to try to resolve the protest amicably. If the protest could not be resolved amicably, then the dispute would be submitted to an arbitrator who would have forty-five days from appointment to decide the protest. The parties would have fifteen days from the arbitrator's decision to make the appropriate payment voluntarily or the money would be taken from a specially designated escrow account. Thus, even if the procedures moved smoothly and within the deadlines, the final purchase price could still take at least 175 days from the closing to be determined and potentially much longer.[6] During this time, CH Medical would continue to accrue post-closing expenses. Thus, the parties' division of expenses incurred more than ninety days after closing is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

Carbona also argues the damages are excessive because the jury should have included in its calculations to answer jury question 12 the one million dollars withheld from the initial calculation of the At Closing Bonus. In paragraph 2 of the Bonus Agreement, the parties agreed that in the initial calculation of Carbona's At Closing Bonus, that is, the amount which Carbona would receive at closing, the amount of "Gross Proceeds of Sale" in the formula would not include one million dollars. The parties agreed in paragraph 4 that in the recalculation of the At Closing Bonus ninety days after the closing, the one million dollars would not be withheld from the "Gross Proceeds of Sale" figure. As discussed above, jury question 12 did not ask the jury to recalculate the formula according to paragraph 4 of the Bonus Agreement; instead, the question asked the jury to determine the amount of Carbona's twenty-five percent share of the closing expenses. The one million dollars does not concern that calculation; it is part of the "Gross Proceeds of Sale" under the formula, not the post-closing expenses. The jury's failure to consider the one million dollars in its answer to jury question 12 is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

We conclude Carbona has not shown the evidence in support of the jury's answer to question 12 is factually insufficient. Accordingly, Carbona is not entitled to a remittitur. We overrule Carbona's fourth issue.

## CARBONA'S COUNTERCLAIM

■ In his fifth issue, Carbona contends he conclusively established his right to judgment on his counterclaim for breach of contract from the companies' failure to pay him a bonus he earned under the Employment Agreement. Although the

---

**6.** The record does not show whether Mediq timely filed a closing statement or whether the parties followed these procedures.

Employment Agreement was terminated at the closing, paragraph 7 of the Bonus Agreement provided,

> any bonuses otherwise due and payable as of the Closing Date to Carbona pursuant to the terms of the Employment Agreement ... shall still be due and payable by Cardio Systems to Carbona as a post closing obligation when the "Ninety Days After Closing" Bonus is paid. Such additional bonus shall be taken into consideration in the recalculation contemplated under Paragraph 3[sic] in determining the "Ninety Days After Closing" Bonus.

The agreement terminating the Employment Agreement stated, "This termination shall not affect any bonuses otherwise due and payable and earned prior to the date hereof." It was undisputed that Carbona earned a bonus of $150,225 [7] under the Employment Agreement and that the companies had not paid him that bonus. The companies judicially admitted they owed Carbona the bonus by including an offset for the $150,225 bonus in their exhibits demonstrating their damages. Furthermore, during closing argument, the companies' attorney told the jurors, "now he's entitled to that 1998 bonus."

The companies assert their failure to pay the bonus did not breach any contract because, they argue, they had no duty to pay the bonus until either the Ninety Days After Closing Bonus, and that distribution never occurred, or when Carbona notified the companies that he was owed the bonus, which the jury found occurred on October 6, 2004. However, the jury found CH Medical was not "excused from paying John Carbona's salary or exercising its right to offset his bonus until John Carbona notified CH Medical, Inc. that he had not been paid." The companies do not challenge this jury finding. Unchallenged jury findings are binding on the appellate court. *Morrell v. Finke*, 184 S.W.3d 257, 285 n. 29 (Tex. App.-Fort Worth 2005, pet. denied); *Lawson v. Lawson*, 828 S.W.2d 158, 161 (Tex. App.-Texarkana 1992, writ denied).

The companies also assert they substantially performed payment of the bonus by paying Carbona "$150,000 for salary which was not owed." The companies do not explain why the $150,000 they paid was not owed. In the exhibits demonstrating their damages, the companies included both the $150,000 payment and the $150,225 unpaid bonus. Those exhibits did not attempt to recover the $150,000 payment but included the payment as an expense in the calculation of Carbona's share of the sale proceeds.

The companies also argue that Carbona is not entitled to judgment in the amount of $150,225 for the bonus because they "have already paid Carbona the bonus ... by a[n] ... offset and reduction in the calculation of the damages he owes" them. However, we have set aside the award of damages to which the companies applied the offset, so this argument is no longer applicable.

We conclude Carbona is entitled to judgment for $150,225 on his breach of contract claim. We sustain Carbona's fifth issue.

Carbona also asserts he is entitled to attorney's fees and prejudgment interest. In the trial court and in this Court, the companies presented various arguments why Carbona was not entitled to attorney's

---

7. The companies argue it was not undisputed and that their chief executive officer, John Stover, testified the companies paid Carbona the bonus. Two bonuses, however, were at issue. One was the $150,225 bonus before us in this issue and the other was a $150,000 bonus that the companies paid in 2004 after learning it was owing. It appears Stover was speaking of the $150,000 bonus in his testimony.

fees and prejudgment interest. The trial court did not reach these issues because it concluded Carbona could not recover on his breach of contract claim. Accordingly, we remand the cause for further proceedings, including determination of Carbona's entitlement to attorney's fees and prejudgment interest. *See Hallman v. Allstate Ins. Co.,* 114 S.W.3d 656, 663 (Tex.App.-Dallas 2003), *rev'd on other grounds,* 159 S.W.3d 640 (Tex.2005).

### PREJUDGMENT INTEREST ON ATTORNEY'S FEES

In their third cross-issue, the companies contend the trial court erred in not awarding them prejudgment interest on the award of their attorney's fees. They assert they paid the attorney's fees that accrued and were billed during the pendency of this action. They argue they are entitled to prejudgment interest on the attorney's fees they paid because they lost the use of this money during the lapse of time between the accrual of the claim and the date of judgment.

■■■ This Court has held, and the supreme court has stated, that prejudgment interest cannot be recovered on attorney's fees. *See C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 325–26 (Tex. 1994), *disapproved on other grounds by*

*Carl J. Battaglia M.D., P.A. v. Alexander,* 177 S.W.3d 893, 909 (Tex.2005); *de la Garza v. de la Garza,* 185 S.W.3d 924, 929 (Tex.App.-Dallas 2006, no pet.). We overrule the companies' third cross-issue.

### CONCLUSION

We reverse the trial court's judgment in part and modify the award of damages on the companies' claim for breach of contract to $796,000, and we vacate the award of prejudgment interest on the damages for the companies' claim for breach of contract. We render judgment that Carbona recover damages of $150,225 from the companies on his claim for breach of contract. We remand the cause to the trial court for further proceedings, including the calculation of the prejudgment interest on the award of $796,000 to the companies and the determination of Carbona's entitlement to prejudgment interest and attorney's fees and the amount of prejudgment interest and attorney's fees to be awarded, if any. In all other respects, we affirm the trial court's judgment.